McIntosh Road Materials Co., Appellant, *v.* Woolworth, Secretary of Property and Supplies et al., Appellants.

192

Argued June 5, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*Earl G. Harrison*, with him *James Conwell Welsh, Louis F. Floge, Wm. A. Schnader, Hall, Hamilton, Wainwright & Welsh* and *Schnader, Harrison, Segal & Lewis*, for plaintiffs.

*Harry F. Stambaugh*, Special Counsel, with him *Robert M. Mountenay*, Assistant Deputy Attorney General, *Phil H. Lewis, Harrington Adams*, Deputy Attorneys General, and *T. McKeen Chidsey*, Attorney General, for defendants.

*Morris Wolf*, with him *Chas. H. Sachs* and *Wolf, Block, Schorr & Solis-Cohen*, for Allegheny Asphalt & Paving Co., intervenor.

*Wm. H. Wood, Arthur Hull* and *Hull, Leiby & Metzger*, for Robert W. Schrech, amicus curiæ.

OPINION BY MR. JUSTICE JONES, June 26, 1950:

This matter is before us on separate appeals by the respective plaintiffs and on cross appeals by the Commonwealth acting by its administrative and fiscal officers named as defendants. The appellant plaintiffs complain of the lower court's refusal of their prayers for an injunction to restrain the defendants from entering into or acceding to any contracts for the furnishing and applying of bituminous materials in the maintenance and repair of State highways (for a specified period) other than as awarded to the plaintiffs and five other successful bidders by the Secretary of Property and Supplies on or about March 1, 1950; the plaintiffs

also complain of the lower court's enjoining of the defendants from proceeding to effectuate the contracts so awarded the plaintiffs,—action which no one sought or requested. On the cross appeals, the Commonwealth assigns for error the action of the court below in declaring illegal, null and void the award of contracts for the furnishing of the specified materials and the performance of the correlative work which the Secretary of Property and Supplies attempted to make on March 29, 1950.

The questions involved relate in the main to the legal effect of the learned chancellor's supportable findings which received the approval of the court en banc and the legal conclusions properly to be drawn therefrom. The following is the factual situation giving rise to the controversy.

On January 18, 1950, the Department of Property and Supplies, acting as the purchasing agent for the Department of Highways,[1] invited bids on proposal forms prepared and furnished by the Secretary of Property and Supplies for certain specified bituminous materials and work in connection therewith for use in the maintenance and resurfacing of State highways in the eleven highway districts of the State during the contract year of April 1, 1950, to March 31, 1951. The bids were sought on alternative bases under three numbered schedules, viz., Schedule 1. for the *furnishing* of the desired materials, Schedule 2. for *applying* them and Schedule 3. for furnishing *and* applying the specified materials. In the fore part of the proposal form, it was stated that in considering the "bids and award of contracts, the right is reserved, by the Commonwealth, to determine the awards to the best interests of the Commonwealth for *either*; Schedule 1, . . . Sched-

---

[1] See Section 2403, Subsection (e), of The Administrative Code (Act of April 9, 1929, P. L. 177, as amended, 71 PS §633).

ule 2 . . . .or Schedule 3 . . . or any combination of bids for Schedules 1, 2, and 3 . . ." (Emphasis supplied). The proposal form stipulated that bidders under Schedule 1 ". . . shall be liable for car service, track storage, and truck transport layover charges, *except* in such cases wherein the layover is caused by weather conditions or due to instructions issued by representatives of the Department of Highways" and it further provided that "The successful bidder shall be liable for demurrage *only* in such cases where demurrage results in the contractor having not complied with shipping instructions issued by the Department of Highways" (Emphasis supplied). That is to say,—on materials for which bids under Schedule 1 were accepted, the Commonwealth would assume a contingent liability for car service, track storage or truck transport layover and demurrage charges. Under Schedule 2, the proposal declared that "the successful bidder *shall not* be liable for car service, track storage or truck transport layover charges, and demurrage . . ." (Emphasis supplied). Wherefore, the Commonwealth by accepting bids under Schedule 2 would assume all contingent charges of the character specified. On the other hand, Schedule 3 provided that "the successful bidder [thereunder] *shall* be liable for all car service, track storage or truck transport layover charges, and demurrage . . .." (Emphasis supplied), so that, for work and material accepted on bids under Schedule 3, the Commonwealth assumed no liability whatsoever for any additional contingent charges such as under Schedules 1 and 2.

The plaintiffs, as well as a number of other contractors, submitted bids pursuant to the "Invitation". The one plaintiff, McIntosh Road Materials Co. (hereinafter referred to as McIntosh Company or McIntosh), submitted bids under Schedules 2 *and* 3; the other plaintiff, Dosch-King Company, Inc. (hereinafter referred to as Dosch-King), submitted bids only under Schedule 3.

The bids were in the form of contracts, fully and completely executed by the plaintiffs so as to be automatically binding on them upon acceptance thereof by the Secretary of Property and Supplies at any time within thirty days from the date set for the opening of all bids. Each of the plaintiffs had complied with the proposal requirement that its bid be accompanied by a certified or bank check for $10,000 as a guarantee of the bidder's faithful effectuation of any award of contract made to it. The security deposit was to be retained by the Department of Property and Supplies in the case of a *successful* bidder until such bidder filed the required performance and labor and material bonds on the contract awarded to it; but it was to be returned promptly, as required by The Administrative Code, to any *unsuccessful* bidder following an award of contracts.

The bids were opened as stipulated by the proposal at 10. A. M. January 30, 1950; and, on March 1, 1950, which was within the thirty-day period during which the bids were to "remain firm", the plaintiffs were severally notified by telegram from the Assistant Director of Purchases (Highways) in the Department of Property and Supplies that awards had been made to them on portions of their bids. The telegrams concluded with "Letter follows." On March 2, 1950, the Secretary of Property and Supplies, acting by the Assistant Director of Purchases (Highways), sent each of the plaintiffs a letter stating that "Tentative award of contract . . . has been made to your company for furnishing and applying bituminous materials as listed on the attached schedule." The letter further stated that "This award is in accordance with your bid submitted on Proposal-Index Number H-4619, bid opening date January 30, 1950", and that "This tentative award is subject to your compliance with the provisions of the proposal form which require that you submit a performance bond and a labor and material bond, each in an amount equal to 50% of

the estimated total amount of the award." On the same day, to wit, March 2, 1950, the Department of Property and Supplies returned to the unsuccessful bidders their security bid checks.

In the letters of March 2, 1950, from the Department of Property and Supplies to the plaintiffs, the Secretary expressly engaged to forward to them later a copy of the release to the Field Offices of the Department of Highways which would "show all awards made on bids received on Proposal-Index Number H-4619"; and, on March 3, 1950, the Department of Property and Supplies did send to each of the plaintiffs a copy of such release in the form of a letter from its Assistant Director of Purchases (Highways) addressed to "All Bureaus, Sections, Units, Sub-Units, District Engineers and Maintenance Superintendents" of the Highway Department. The letter specifically declared that "Contracts, for furnishing and applying bituminous materials for the period April 1, 1950, to March 31, 1951, *have been awarded* to: [seven named companies]" whereof the plaintiffs were two (Emphasis supplied). The letter further disclosed that all of the contracts had been awarded on the basis of bids under Schedule 3 which, as will be recalled, was the schedule that required the contractor both to furnish the materials and to apply them at the bid price without any liability whatsoever to the Commonwealth for car service, track storage, truck transport layover charges or demurrage.

The total amount of the contract for material and work so awarded to McIntosh Company was $885,313, and to Dosch-King, $444,459. On March 3, 1950, the day following the Department's letter to the plaintiffs confirming the award of contracts to them, the Dosch-King Company forwarded to the Department of Property and Supplies its two bonds, each in the appropriate amount of $222,229.50 with responsible corporate surety; and on March 7, 1950, McIntosh Company likewise for-

warded to the Department of Property and Supplies its two bonds, each in the required amount of $442,656.50, with responsible corporate surety. Both of the plaintiffs were orally advised by the Department of Justice that these bonds had been approved; and it was admitted for the Commonwealth, at trial, that the bonds had been duly approved by the Department of Justice.

Inasmuch as performance by the contractors under the awards of March 1st, as confirmed by the Secretary's letter of March 2, 1950, could be required from April 1, 1950, onward under a $50-a-day penalty for a contractor's delay in performing, the plaintiffs as awardees of contracts at once set about to prepare themselves for timely performance. The learned chancellor, acting for the court en banc in disposing of McIntosh's exceptions, found that McIntosh "purchased four additional distributor trucks at a cost of approximately $50,000, which trucks were delivered to [it] on or about March 28, 1950. . . . [and McIntosh also] entered into written contracts with Atlantic Refining Company, dated March 3, 1950, for a total of 4,745,000 gallons of bituminous materials [out of its total requirement of 6,605,000 gallons under its award] to be applied pursuant to the award. In addition, [McIntosh] called its men back to work and hired twelve additional employees to get ready to perform the contract on April 1, 1950." The chancellor also found, and the court below approved, that the Dosch-King Company likewise "made preparation for furnishing and supplying the materials included in the awards made to [it] as listed upon the schedule accompanying the letter of March 2, 1950 . . . . [Dosch-King also] entered into contracts with Standard Oil Company of New Jersey and Riley Tan & Chemical Company for bituminous materials to be applied pursuant to the award."

On March 29, 1950 (just two days before the beginning of the contract term), the Secretary of Property

and Supplies, acting by his Deputy, addressed to the plaintiffs letters purporting to recall the award made on March 1, 1950, and further purporting to make a "new award" of contracts for the desired materials and work to eleven bidders. Six of the latter were among the prior unsuccessful bidders whose bid-guarantee checks had already been returned to them by the Department of Property and Supplies. The chancellor found that the Department of Property and Supplies privately negotiated with the six unsuccessful bidders for the purpose of making the award of March 29th and sought their consent thereto.

The reason assigned by the Deputy in his letters of March 29th for the proposed "new awards" was that, as against making awards to the lowest bidders under Schedule 3 exclusively, "a still lower combination of bids was available if Schedules '1' and '2' were considered along with Schedule '3' and the lowest combinations picked from one or the other Schedules." As proof thereof, the Department's letter of March 29th set out that, while the total amount of the awards made March 1, 1950, was $2,415,875, the total amount of the proposed "new awards" arrived at by taking Schedules 1, 2 and 3 in combination was $2,397,309 or a putative saving to the Commonwealth of $18,566. The calculation did not reckon, however, with the possibly heavy contingent liability attaching to the Commonwealth if bids under Schedules 1 and 2 were infused with the bids under Schedule 3.

The Secretary's attempted revision of the awards of March 1, 1950, was inspired by the expressed dissatisfaction of the President of the Lake Asphalt & Petroleum Company of Pennsylvania (hereinafter referred to as Lake Asphalt), one of the prior unsuccessful bidders, who claimed that his company was low bidder. At trial, the Deputy Secretary testified that, on March 28, 1950,

the day before he wrote the letters of purported recall and "new awards", he had called on the President of Lake Asphalt at the latter's office "to see whether he would agree whether he felt that the Commonwealth should go ahead with the awards it had made, whether he felt his position was such he should insist upon his right as low bidder . . . ." And, as a consequence, the Deputy's letter attempting a recall of the March 1st award and the making of "new awards" went out the succeeding day, viz., March 29th. Thereby Lake Asphalt, which no longer had a bid-security check on deposit with the Department of Property and Supplies, was "awarded" a contract for the total sum of $712,373 for materials to be furnished under Schedule 1.

The effect of the proposed "new awards" of March 29th upon the plaintiffs, if carried out, would have been to reduce the total amount of McIntosh's contract from $885,313 to $315,715 and Dosch-King's, from $444,459 to $288,578. The only one of the original successful bidders whose award was not diminished (or eliminated) by the Secretary's attempted action of March 29th was Allegheny Asphalt and Paving Company which had a March 1st contract award for $659,362 worth of materials and work on its bids under Schedule 3. The Department's letter of March 29th purported to make a similar award. Allegheny Asphalt is a present intervenor.

It was upon averments based on the facts as above set forth, or to which reference has been made, that the plaintiffs promptly filed the instant suits and, in their bills of complaint, sought to enjoin and restrain (a) the Secretary of Property and Supplies from entering into any contract with anyone other than the plaintiffs for the furnishing and applying of the highway materials included in the awards made to them on March 1, 1950, (b) the Secretary of Highways from ordering or requisitioning from anyone except the plaintiffs the furnishing of materials and the performance of the work included

within the awards made to them, (c) the Auditor General and State Treasurer, respectively, from approving any requisitions for the payment of, or paying out, any moneys from the State treasury to anyone other than the plaintiffs for furnishing the materials and performing the work included in the above mentioned awards to the plaintiffs and (d) to require the Secretary of Property and Supplies to execute contracts with the plaintiffs in accordance with the several awards made to them on March 1, 1950, and the Auditor General and State Treasurer to approve the same.

The defendants jointly answered, substantially admitting all the material averments of the bills of complaint. As to the averment that ". . . the attempted cancellation of prior awards and substitution of new and different awards, instead of effecting a saving to the Commonwealth . . . would in fact result in a net increase in cost to the Commonwealth of many thousands of dollars", the defendants concessively answered that "the making of an award as proposed on March 29, 1950, may result in an increase in cost in supervising, inspecting, making payments to or otherwse dealing with the larger number of contractors involved." The defendants further alleged that ". . . the amount of any additional cost would depend upon many conditions, such as efficiency and promptness of particular contractors, weather conditions and many other factors which cannot now be determined or estimated, and . . . that they have no personal knowledge, and have made due inquiry and can obtain none as to whether the proposed award will result ·in a net increase in cost to the Commonwealth . . . ." The chancellor found in such regard that, "In prior years there had been demurrage paid by the Commonwealth under contracts covering the same type of materials as herein specified, the amount of which demurrage was charged according to the contract provisions and the awards therein made", but also found that "There

was nothing to indicate to the Department of Property and Supplies what would be the amount of the demurrage under the revised award of March 29, 1950."

Following a hearing on the merits of both suits, the learned chancellor made findings of fact and conclusions of law and entered an identical decree nisi in each suit to all of which the respective plaintiffs and the defendants filed exceptions. After argument of the matter on the pleadings and testimony before the court en banc, the chancellor entered orders disposing of the exceptions, filed an adjudication and entered a final decree (applicable to both suits) from which these appeals were taken. As already indicated, the decree on appeal (a) declared illegal, null and void "the contract awards, referred to in the letter of the Department of Property and Supplies and dated on or about March 29, 1950, the same being the awards made to eleven bidders subsequent to the prior awards of March 2, 1950, to seven bidders . . ." and enjoined and restrained "the defendants . . . from entering into any contracts on the basis of such awards dated March 29, 1950, or otherwise recognizing or giving any effect thereto, or from paying out any public funds in connection therewith" and further (b) invalidated "the prior awards dated March 2, 1950," and "declared [them] to have no force and effect" and enjoined and restrained the defendants "from entering into any contracts on the basis of said awards of March 2, 1950, or from giving any force and effect thereto, or from paying out any public funds in connection therewith."

Wholly apart from the question of the continuing validity and effect of the award of March 1, 1950, which we shall consider hereinafter, the portion of the decree which declares the purported contract awards by the Secretary of Property and Supplies on March 29th to be illegal, null and void is so manifestly correct as not to admit of any doubt.

A bidder's security check deposited with the Secretary of Property and Supplies was an essential part of a Bid Proposal. It was expressly required by relevant statute (The Administrative Code, Sec. 2409, 71 PS §639). And it is necessary that such provisions be strictly followed: cf. *Flynn v. Philadelphia,* 258 Pa. 355, 361, 102 A. 24; *Louchheim v. Philadelphia,* 218 Pa. 100, 102, 66 A. 1121; and *Hinkle v. Philadelphia,* 214 Pa. 126, 131-132, 63 A. 590. The Proposal on its face specifically introduced the bid-security requirement as "IMPORTANT". Yet, six of the eleven recipients of the March 29th awards did not then have such security checks on deposit with the Secretary of Property and Supplies. The return of their checks to them, as unsuccessful bidders, on March 2, 1950, following the award of contracts on March 1st, was but appropriate compliance with cognate statutory directions: The Administrative Code, Sec. 2409. Any deviation from the legal requirements in the premises in favor of any bidder would not only be discriminatory but it would be culpably violative of the law: see *Harris v. Philadelphia,* 283 Pa. 496, 508, 129 A. 460. In no sense was the return of the security checks to the unsuccessful bidders a mere "technical irregularity" as the brief for the defendants suggests. Nor could the situation have been altered "by the return of the certified check [to the Secretary of Property and Supplies] or the filing of a new one." Legal authority for any such procedure has not been cited; and none has come to our attention.

In the *Harris* case, supra, it was discovered, upon the opening of bids for millions of dollars worth of municipal work, that the $825,000 bid-security check of the lowest responsible bidder was about $12,500 short of the required percentage under applicable ordinance. Apparently, the relatively small deficiency in the security deposit was due to the bidder's inadvertent oversight of one contract item. The bidder was at once given per-

mission to, and the same day did, deposit an additional bid-security check for $25,000, which, of course, more than covered the shortage. The city department having charge of the matter was advised by the City Solicitor that the bid could not be considered in the awarding of contracts because of the irregularity in connection with the deposit of the bid security. Thereupon, a taxpayer filed a bill to enjoin the director of the department "from rejecting or refusing to consider the lowest bid because of the irregularity connected with the deposit." After hearing, the lower court dismissed the bill and this court affirmed with the positive ruling that ". . . the requirement of a deposit is not a mere technical irregularity which is subject to correction after the bids are open, in the discretion of the director, but a mandatory requirement imposed by ordinance which must be fully complied with by the bidder as a condition precedent to a consideration of his bid." The rationale of the ruling is no less applicable where the requirement is imposed directly by statute. The defendants seek to distinguish the *Harris* case from the present by saying that "Not only was [the bid-security] requirement [in that case] not complied with, but in addition the particular bidder was shown very definite favoritism and an attempt was made to overlook his default in filing his certified check." The words thus employed by the defendants in an effort to distinguish peculiarly confirm the present pertinency of the *Harris* case.

Even had the security checks of the unsuccessful bidders, under the March 1st award, still been in the hands of the Secretary of Property and Supplies on March 29th, the purported award of contracts on the latter date would have been no less invalid. As already stated, the chancellor found, and the evidence supports the finding, that "The Department of Property and Supplies privately negotiated with six prior unsuccessful bidders for the purpose of making the award referred to

in the letter of March 29, 1950, and sought the consent of these bidders in connection with making that award." On the basis of that finding the learned chancellor correctly drew the following legal conclusions: ". . . the Secretary of Property and Supplies did not have the power to negotiate privately with the unsuccessful bidders for the purpose of obtaining a total price less than the tentative award. . . . The award referred to in the letter of the Secretary of Property and Supplies dated March 29, 1950, and made pursuant to these private negotiations, must be declared to be null and void and of no effect." Negotiations of such nature were foreign to the purpose and spirit of the law relative to the requirements for bidding and the award of contracts for public work: see *Louchheim v. Philadelphia,* supra, at p. 103; cf. also *Harris v. Philadelphia,* supra, pp. 503-504.

It is to be noted that the learned chancellor stated in his adjudication that there was nothing to support a conclusion that the Secretary did not act in good faith and that the record indicates that the negotiating with unsuccessful bidders was done in good faith by the Department. As much may be readily accepted and is not here questioned. Nonetheless, the chancellor overruled the defendants' exceptions as to the disqualifying private negotiations. What the Secretary's motive was is quite immaterial. The consequent award would have been equally invalid had the original award been lawfully nullified.

So much disposes of the Commonwealth's appeals. The purported award of March 29th was wholly abortive and no award of any contract can be predicated thereon. The intervenor's rights, as well as the plaintiffs', whatever they may be, must therefore rest upon the award of March 1, 1950. That brings us to a consideration of the current legal status of that award.

The court based its ultimate action with respect to the March 1st awards on the attempted recall thereof

by the Deputy Secretary's letter of March 29, 1950. In so doing, the chancellor expressly approved the defendants' contention that ". . . the Secretary of Property and Supplies, acting through his Deputy, in the exercise of his sound discretion, had the right to recall or cancel the tentative award if it appeared that the best interests of the Commonwealth required such recall." While the purpose so assumed is commendable, the proposition is, nonetheless, fundamental error. The time for the Secretary to be scrupulously alert in the exercise of his discretion for "the best interests of the Commonwealth" is when the bids are opened, as advertised, and he makes his award of contracts accordingly. Thenceforth, he is without further discretion in the matter and cannot vitiate such an award except for fraud, collusion or legally disqualifying error. There is not the faintest intimation in this case that there was any such fault in the original award. In so saying, we are not unmindful of the defendants' contention that a low bidder was eliminated by the March 1st award. That, we shall consider later.

The Secretary's bona fide exercise of his discretion by his award of March 1st rendered his power in such regard *functus officii.* His discretion was at an end: *Pearlman v. Pittsburgh,* 304 Pa. 24, 29, 155 A. 118; see also *United States v. Purcell Envelope Company,* 249 U. S. 313, 318. In *Williams v. City of Stockton,* 195 Cal. 743, 235 P. 986, the plaintiff was awarded by ordinance a contract for certain public work. The ordinance directed the Mayor to sign a written contract which he failed to do prior to the expiration of his term; and a new administration revoked the award by subsequent ordinance. In holding that the plaintiff had become vested with a right to have the contract signed, the Supreme Court of California aptly quoted from Section 143 of Donnelly on the Law of Public Contracts as follows: "When an award has once been made the public body has no discre-

tion but to execute the contract. The rights of the parties then become fixed, and the power to cancel the award or reject the bids does not exist. The obligation of the contract made cannot thus be impaired at the option of one of the contracting parties." The purpose and spirit of secret bidding for public work dictate the rigor of the rule in order that no opportunity for favoritism or discrimination in the final awarding of contracts be afforded. Furthermore, the essentiality of the requirement is peculiarly indicated where bids are taken in the *alternative*, i.e., for all and, also, for parts of the same work and materials. Such circumstances are pregnant with possibilities for reshuffling of bids and favored awarding of contracts.

Contrary to the defendants' contention, the award was not tentative so far as any continuation of permissible discretion in the Secretary was concerned. It was tentative *only* in the sense that the plaintiffs' deposit of the required performance and material bonds was a prerequisite to the finality of the awards made to them. When the plaintiffs filed such bonds, which they did promptly, and the bonds were approved by the Department of Justice, as they duly were, *the plaintiffs* were thereupon as effectually bound contractually *as if* the signed formal instruments had been delivered. Nor is any legal defect to be imputed to the action of the Secretary of Property and Supplies because he acted in the matter of the contract awards by his Deputy or by the Department's Assistant Director of Purchases (Highways). Section 206 of The Administrative Code (71 PS §66) expressly authorizes any department head to act "either personally, by deputy, or by the duly authorized agent or employe of the department . . . ." The authority of the Deputy and of the Assistant Director of Purchases has nowhere been denied or questioned in this proceeding. Their competency to act in the premises is conceded by the defendants; and their acts in such connection

were implicitly and correctly adjudged by the court below to be the acts of the Secretary of Property and Supplies.

In ascribing to the Secretary of Property and Supplies power in the circumstances to recall his award of contracts of March 1st, the court below was apparently motivated by an assumption that the award had not been made to "the lowest responsible bidder." Such an assumption is not borne out by the record either factually or legally. Incidentally, no one assailed the award of March 1st, directly, as being invalid on the ground that it was not made to the lowest responsible bidder. Indeed, no such issue was litigated below. But, it becomes material here because of the dispositive action taken by the court below with respect thereto. "The lowest responsible bidder" is not *ipso facto* the one whose bid is the lowest dollar. In *Hiorth v. Chester City*, 282 Pa. 387, 388, 127 A. 836, the bill seeking to enjoin the award of a municipal contract contained no allegation of fraud or misconduct on the part of the defendant city's officials, the sole reason alleged in support of the relief sought being that the awardee was not "the lowest responsible bidder" and, therefore, not entitled to receive the contract under the provisions of a relevant statute. We there said that "We have held on numerous occasions that 'lowest responsible bidder' does not necessarily mean the bidder whose offer to do the work is the lowest. In the recent case of Hibbs et al. v. Arensberg et al., 276 Pa. 24-29, we said, 'The term "lowest responsible bidder" does not mean the lowest bidder in dollars; nor does it mean the board may capriciously select the highest bidder regardless of responsibility or cost. What the law requires is the exercise of a sound discretion.' " See, also, *Brener v. Philadelphia*, 305 Pa. 182, 186, 157 A. 466; *Kratz v. Allentown*, 304 Pa. 51, 54, 155 A. 116; and *Wilson v. New Castle City*, 301 Pa. 358, 364-365, 152 A. 102.

How, in the light of the Commonwealth's contingent liability for additional charges for car service, demurrage, etc. on materials or work accepted under Schedules 1 or 2 could it possibly be said that bids under either of those Schedules constituted "the low bids of record" as the Deputy Secretary subsequently denominated them? Estimates of such additional charges were sought from officials in the Highway Department which they proved incapable of furnishing because of the many conditional elements entering into the calculation, such as weather, efficiency and promptness of contractors, etc. "Therefore," the Deputy concluded, "we had no alternative but to take the low bids of record",—bids, from the reckoning wherewith, there were thus excluded the almost certain additional charges which, as the chancellor found, the Commonwealth in prior years had paid under contracts covering the same type of materials as here involved. Why, it may be asked, was the Secretary then confronted with any alternative? Had contracts for the materials and work not already been awarded on March 1st?

Nothing has been shown that even suggests the slightest impeachment of the discretion exercised by the Secretary in making that award. It was made to the low bidders under Schedule 3 whereby liability for contingent charges, such as car service, demurrage and the like, was upon the contractors and not upon the Commonwealth. The claimed saving in the estimated costs of the materials and work by combining bids under Schedules 1 and 2 with Schedule 3 was but $18,566, whereas in 1948 the Secretary rejected bids under similar Schedules 1 and 2 which were $30,000 lower than a bid under Schedule 3 for which the contract was awarded because the demurrage and other possible costs to the Commonwealth involved in buying the materials and having the work done under Schedules 1 and 2 would not be present under Schedule 3. The acceptance of the bids under

one of the alternate Schedules was, moreover, in strict keeping with the terms of the Proposal which had received the approval of the Department of Justice before it was issued by the Department of Property and Supplies to prospective bidders.

Where bids for public work are invited and received in the alternative, there is a presumption, in the absence of fraud or collusion, that the public officials charged with the duty of awarding a contract thereunder acted in good faith and in the best interests of the governmental agency in making the award: see *Wilson v. New Castle City,* supra; and *Parker v. Philadelphia,* 220 Pa. 208, 212, 69 A. 670. Nor will such an award be set aside except upon clear proof of abuse of discretion by the officials who made it: *Wilson v. New Castle City,* supra; and *Hibbs v. Arensberg,* supra. Here, there is *no* proof, let alone *clear* proof, of any such abuse of discretion in the making of the March 1st award.

In the circumstances here obtaining, approval by the Governor, the Auditor General and the State Treasurer of the March 1st *award* (as distinguished from the formal contracts) is necessarily to be presumed. We are not now considering Subsection (c) of Section 2403 of The Administrative Code, as amended by the Act of July 5, 1947, P. L. 1349, upon which the defendants rely, but Section 2409 (71 PS §639) which provides that "All contracts *awarded* shall be severally void unless *first approved* by the Governor, the Auditor General, and the State Treasurer. . ." (Emphasis supplied). The Attorney General in his brief for the defendants correctly interprets Section 2409 to mean that, —"This requirement is made expressly applicable to contracts *'awarded'* and they must be 'first approved', that is, before a contract is awarded." The Section is not reasonably susceptible of any other construction. It will be borne in mind that there is no statutory requirement that the of-

ficials named in Section 2409 give their approval in writing. Nor does the fact that the contract form contains blank spaces for the signatures of such officials impose any requirement as to a signed approval. The Secretary of Property and Supplies being chargeable, as he was, with knowledge of the law's requirement that the *award be first approved* by the officials named in Section 2409 before the contracts be awarded and knowing, also, when he returned the bid checks to the unsuccessful bidders, that he was under an express statutory duty not to return them *until the award had been approved,* a finding that the award was not duly approved cannot be made in the absence of positive proof to such effect. There is not a word of evidence in these cases nor any allegation by the Auditor General or the State Treasurer, who are parties to the record, that they had not approved the award of March 1st. Nor is there any suggestion by the Secretary of Property and Supplies, likewise a defendant and an administrative officer of the Executive Department and an appointee of the Governor, that the latter had not approved the award or that the Secretary made the award and returned the unsuccessful bidders' checks without such prior approval. In the absence of proof to the contrary, the law presumes that a public official's actions were pursuant to proper authority and that the antecedent steps necessary to give validity to his official acts were duly taken. In *Erie City v. Piece of Land,* 308 Pa. 454, 458, 162 A. 445, it was said that "Public officers are presumed to have properly performed every duty and met every requirement necessary or essential to the validity of their official acts: Houseman v. International Navigation Co., 214 Pa. 552; Lehigh Val. Coal Co. v. Northumberland Co., 250 Pa. 515; Falkinburg v. Venango Township, 297 Pa. 358. This presumption is so strong that it is tantamount to presumptive proof of the antecedent acts necessary to sustain validity: Houseman v. International Navigation Co.,

supra." See, also, *Miners Savings Bank of Pittston v. Duryea Borough,* 331 Pa. 458, 463, 200 A. 846; *Fleming v. Adamson,* 321 Pa. 28, 37, 182 A. 518; *Vernon Township v. United Natural Gas Co.,* 256 Pa. 435, 439, 100 A. 1007; and *Beacom v. Robison,* 157 Pa. Superior Ct. 515, 521, 43 A. 2d 640. There is only one presumption here indulged and that is that, when the Secretary of Property and Supplies made the award of contracts on March 1, 1950, he acted *according to law,* viz., after compliance with and fulfillment of all antecedent legal requirements. The integrity, as well as the finality, of the award of contracts on March 1st is thus established. We are not to be understood, however, as holding that, because of the extant award, the plaintiffs have binding and enforceable contracts with the Commonwealth. What we do hold, as will now appear, is that the award gives to the awardees, who stand bound by the contracts under heavy bond, a right to have such awarded contracts submitted to the Governor for his approval.

It is the defendants' contention that the Governor's approval of the formal contracts, *as distinguished from the award thereof,* is now essential to the contracts' validity by reason of the requirement of Subsection (c) of Section 2403 of The Administrative Code, as amended by the Act of July 5, 1947, P. L. 1349 (71 PS §633 Pkt. Part), which empowers the Department of Property and Supplies, —"(c) To enter into contracts with the lowest responsible bidder for the purchase of all other furniture, materials or supplies requested by the Legislative, and other departments of the State Government, except as otherwise provided by this act. All such contracts shall be approved by the Governor, and signed on behalf of the Commonwealth by the Secretary of Property and Supplies, who shall also, with the approval of the Department of Justice, prescribe rules and regulations for the submission of bids, awards, forms of contracts and other matter related thereto."

The plaintiffs argue that the contracts to which Subsection (c) of Section 2403 has reference are only such as the Department of Property and Supplies enters into in fulfillment of its direct and separate departmental obligations and duties and not to such contracts as it awards in its representative capacity as the "purchasing agency" for another department and that, therefore, the provision in question is not applicable to the Property and Supplies Department's purchase of road materials for the Highway Department pursuant to the procedure specified by Section 2409 of The Administrative Code. If the additional requirement of the Governor's approval of the contracts entered into by the Department of Property and Supplies was meant to apply to contracts for materials required by the Highway Department and paid for out of funds allocated to that Department, then, why was the provision not inserted by amendment in the "All contracts" clause of Section 2409? Or, what legislative intent could there have been for requiring the Governor's approval of a contract awarded by the Secretary of Property and Supplies for the Highway Department when the Governor's approval of the award of such a contract was already statutorily required? On the other hand, the Attorney General contends that the "All contracts . . ." phrase in Subsection (c) of Section 2403 is all-inclusive and embraces all contracts entered into by the Department of Property and Supplies, whether for its own direct service or in its representative capacity; that the added requirement of contract approval in Subsection (c) of Section 2403 is but cumulative to the contract-award approval required by Section 2409 and must be read in conjunction therewith; and further stresses that the *1947* amendment of Subsection (c) was the first time that the Secretary of Property and Supplies was expressly required by statute to *sign* awarded contracts on behalf of the Commonwealth. But, surely, the latter argument cannot be meant to imply that,

throughout the existence of The Administrative Code, the Secretary of Property and Supplies had not signed on behalf of the Commonwealth contracts awarded, and, especially, contracts awarded by his Department as the "purchasing agency" of another department.

No point is to be served by detailing further the respective contentions of counsel in this connection. It is sufficient to say that the question of statutory construction here involved is by no means free from doubt. But, the learned court below accepted the Attorney General's view and held that Subsection (c) of Section 2403 pertained to all contracts awarded by the Department of Property and Supplies and we are disposed to do the same. It follows, therefore, that in addition to the Governor's approval of contract *awards* pursuant to Section 2409 of The Administrative Code, his approval of the formal *contracts* is *now* required by virtue of Subsection (c) of Section 2403, as amended. Any seeming anomaly in the requirement of the added approval is the direct result of the 1947 enactment of Subsection (c) which was a piecemeal amendment of a comprehensive Code apparently without regard for the intent and scheme of the whole. Such approval, however, just as in the case of an award, need not be in writing. There is no statutory requirement that the Governor evidence his approval of either the award or the contract in writing although his signature at the place provided therefor on the contract form affords a facile and desirable means of supplying direct proof of his approval of such contract.

The situation thus arrived at is that the award of contracts by the Secretary of Property and Supplies on March 1, 1950, to the plaintiffs and to the intervenor, inter alia, was valid when made and continues so to be, wholly unaffected by the effort of the Deputy Secretary of Property and Supplies on March 29, 1950, to set it aside, the Deputy Secretary's action in such regard being void and of no effect. Consequently, the March 1st

award is still binding and subsisting and cannot now be lawfully obviated. Its validity necessarily became an issue on these appeals because of the final disposition made thereof by the decree of the court below. We, therefore, declare, as a matter of law, that the award of March 1st was the exercise of a sound discretion by the awarding officials and that it may not any longer be legally assailed. What, then, is the character of the relief to be granted? Involved in the answer to that question are considerations of highest public importance not only on account of the legal requirement that the rules relating to awards of contracts for public work must be pursued meticulously in spirit as well as in letter, but, also, because of the urgency, which the defendants stressed in their answer, that no further delay be permitted to postpone longer the delivery and application of the highway materials for which the contracts were awarded.

Accordingly, so much of the decree entered by the court below as declared the attempted award of contracts of March 29, 1950, illegal, null and void and enjoined effectuation thereof is affirmed. The remainder of the decree is reversed. The bills are reinstated and it is hereby ordered and decreed (1) that the Secretary of Property and Supplies sign, on behalf of the Commonwealth, the contracts awarded by him on March 1, 1950, to the plaintiffs, to the intervenor and to others, (2) that the Auditor General and State Treasurer evidence their approval of the award by signing the contracts at the places provided therefor and (3) that the Secretary of Property and Supplies then submit said contracts, as so executed, to the Governor, as in the ordinary course, for his approval; the costs on all appeals to be paid by the defendants.

DISSENTING OPINION BY MR. CHIEF JUSTICE DREW:

While I concur with the majority in holding that the attempt to award contracts on March 29, 1950, was a

nullity, I must dissent from the view that binding con-tracts were entered into with appellant companies on March 2, 1950, for the reason that it completely ignores the plain mandates of the statute governing the purchase of materials for state use. The record here before us con-clusively shows that the provisions of the applicable statute were not fully complied with, and therefore, no contracts came into being between the Commonwealth and appellant companies.

It is a fundamental rule of law that contracts ex-ecuted with a state government, contrary to the manda-tory provisions of a statute, are invalid and unenforce-able. The authority of the Commonwealth to contract must be exercised in the manner provided in the statute conferring it: *Carpenter v. Yeadon Boro.*, 208 Pa. 396, 57 A. 837. "he who deals with a municipality [or the state] must recognize that it can contract only upon such terms as the legislature has seen fit to prescribe": *Commonwealth v. Jones*, 283 Pa. 582, 586, 129 A. 635; *Coyle v. Pittsburgh*, 344 Pa. 426, 25 A. 2d 707.

We are here concerned with the interpretation of sec-tion 2403 (c) and section 2409 of The Administrative Code, Act of April 9, 1929, P. L. 177, as amended. Sec-tion 2403 (c)[1] provides that the Department shall: ". . . To enter into contracts with the lowest responsible bidder for the purchase of . . . materials or supplies requested by the *Legislative, and other departments* of the State Government, except as otherwise provided by this act. *All such contracts shall be approved by the Governor, and signed on behalf of the Commonwealth by the Secretary of Property and Supplies,* who shall also, with the approval of the Department of Justice, prescribed rules and regulations for the submission of bids, awards, forms of contracts and other matter re-lated thereto." (Italics added). Section 2409 states,

---

[1] As amended by the Act of July 5, 1947, P. L. 1349, §2.

inter alia: "All contracts awarded shall be severally void unless first approved by the Governor, the Auditor General, and the State Treasurer. . . ." This latter section prescribes the procedure to be followed by the Department of Property & Supplies in obtaining bids, preparing schedules and generally defines the limits of the discretion to be exercised by the Secretary of that department. The former section, on the other hand, sets forth the powers and duties of the Department of Property & Supplies and specifically provides the manner in which contracts are to be made for the purchase of materials necessary for the legislative and other departments of government. These two sections must, therefore, be read together, and when so read it is quite clear that, before a contractual obligation on the part of the Commonwealth comes into existence, a contract must be prepared and signed by the Secretary of Property and Supplies on behalf of the Commonwealth and approved by the Governor, the Auditor General and the State Treasurer. In other words, it was the intent of the legislature that it was the final written instrument, and not the preliminary arrangements preparatory thereto, which would create a binding contract on the part of the Commonwealth.

In the instant case, plaintiffs, have failed to produce any evidence of a contract signed by the Secretary of Property and Supplies. They rely upon a letter, dated March 2, 1950, signed by the Assistant Director of Purchases on behalf of that officer, informing them that a "tentative award of contract" had been made to them and further that "upon receipt of the bonds and approval of the bonds by the Department of Justice, final award will be made . . ." which they contend, and the majority agrees, was a sufficient acceptance to constitute a binding contract. That letter was not intended to create, nor could it create, any such obligations, inasmuch as the provisions of The Administrative Code had not been

complied with. That communication was written merely to notify the bidders that their bids were the lowest ones made, and that it was incumbent upon them to file the performance bond and labor and material bond required by Section 2408 (h) of the Code which would meet with the approval of the Department of Justice. However, the letter did not attempt to enumerate the remaining statutory steps required to be taken by the Commonwealth before a contract would result, i.e. a contract accepting their proposals, in written form approved by the Department of Justice, and executed by the Secretary of Property and Supplies with the approval of the Governor, the Auditor General, and the State Treasurer noted thereon. In no way could appellants be justified in concluding, or the majority in holding, that the letter of March 2 satisfied the statutory requirement.

Conceding that a contract must be approved by the three named officials of the Commonwealth and that it nowhere appears in this record that such approval was obtained, nevertheless the majority holds that a presumption arises that such approval was actually secured. It bases such presumption on the theory that a public official, such as the Secretary of Property and Supplies, complied with the Code, and would not have written his letter of March 2, without obtaining such approval. The majority has fallen into error in this regard also, for obviously no presumption could possibly arise under the circumstances here presented. This Court said, in *Hill v. Alexander*, 338 Pa. 26, 32, 11 A. 2d 884: "It is true that honesty of purpose and good faith in the performance of acts in their official capacity will be assumed by the courts on the part of persons holding responsible public positions, until the contrary clearly appears . . . , but manifestly this principle cannot aid appellants' case, for no amount of good faith and honesty of purpose on the part of the commissioners can render effective action which is abortive for failure to comply with the manda-

tory requirements of the law governing such action."
See also 31 C. J. S., Sec. 146 (b), pp. 806-807-808. More-
over, to infer the approval of the Governor, the Auditor
General and the State Treasurer from an act of Assist-
ant Director of Purchases, would violate the well estab-
lished rule that one presumption cannot be based upon
another: *Neely et al. v. Insurance Co.,* 322 Pa. 417, 426,
185 A. 784; Henry, Pa. Trial Evidence (3rd Ed.), §384,
pp. 574, 577. Such a presumption would permit of an
oral approval by the requisite officials. When the Legis-
lature stated "approval", it obviously meant approval
in writing, for that is the only possible means by which
a record of such approval could be available to show
that the statutory requirement in this regard has been
satisfied. "Whenever, either by constitutional or legisla-
tive requirement the president of the United States, the
governor of a state or the mayor of a city is required to
approve an act of congress, or of a legislature, or of a
court of common council, the word 'approve' means more
than the unexpressed mental acquiescence of the individ-
ual in the propriety of what has been done; it means that
the officer, in his official capacity, as the guardian of the
interests of a community, having in view its welfare, and
not his personal wish or advantage, shall consider the
proposed legislation and determine that it is proper, and
make that fact known to all men with absolute certainty,
by some visible, unmistakable and enduring mark, to
wit, by written declaration attested by his signature. It
is not enough that in the future when the question is
made—is such an act of congress, of legislature or of
common council binding upon the country, state or mu-
nicipality, that it should depend for decision upon the
memory and testimony of an officer as to what was his
unexpressed thought, at a former time, concerning it.
Such uncertainty would be unendurable, and, therefore,
we must assume it to be outside of the meaning of any
constitution or law.": *N. York & N. England R. R. Co.*

*v. City of Waterbury*, 55 Conn. 19, 23-24, 10 A. 162; see also *Rooney v. South Sioux City*, 111 Neb. 1, 195 N. W. 474. It must also be said that it is a complete non sequitur to hold that because the checks of the unsuccessful bidders were returned, as required by the Code, that we must presume that the award had been approved. Because one provision of the Code has been followed is no indication that the other provisions have also been complied with.

Realizing that Section 2403 (c), requiring that a written contract be executed by the Secretary of Property and Supplies and approved by the Governor, has not been satisfied, the majority seeks to create an artificial distinction under the Code, between contract *awards* and formal *contracts*, where none in fact exists. This leads to the ridiculous proposition that the Governor must approve an already binding obligation that he has previously approved. This Court should not conclude that the Legislature intended such an absurd result. The untenability of the majority's position in this connection is further emphasized by the order which it has entered. It has directed the Secretary of Property and Supplies to submit the executed contracts to the Governor for his approval. If he refuses to approve, as he has the legal right to do, appellants are then in the unenviable position of having a valid contract which is unenforceable in law.

Since no contract came into existence between the Commonwealth and appellant companies without the approval of the Governor, the Auditor General and the State Treasurer, the Secretary of Property and Supplies had the right to inform appellants, under the facts presented, that their bids had been rejected. Therefore, since no contracts exists between the Commonwealth and appellant companies and the 30-day period, during which bids were to remain firm, has long since passed,

a new request for bids must be made by the Commonwealth before the desired contract can be executed.

I would therefore affirm the decree of the learned court below.

Mr. Justice BELL concurs in this dissent.