## Blastein v. City of Philadelphia et al.

*Martin J. Cunningham, Jr.,* for plaintiff.

*Abraham L. Freedman,* City Solicitor, and *Herbert M. Linsenberg,* Assistant City Solicitor, for defendants.

CARROLL, J., January 31, 1955.—This is a taxpayer's action brought to set aside an award of a restaurant concession at Convention Hall, Commercial Museum.

### Statement of Pleadings

The pleadings consist of a complaint by plaintiff and an answer by defendant.

In the complaint, plaintiff avers generally that the award to the highest bidder for restaurant concession rights in the Commercial Museum and Convention

Hall in the City of Philadelphia was made in violation of law and specifically in violation of the provisions of the Philadelphia Home Rule Charter contrary to the best interests of the taxpayers of the City of Philadelphia of which plaintiff is one.

The answer denies any illegality in the award to the highest bidder and avers that the award was made in strict accordance with section 8-201 of the Home Rule Charter and with regard for the best interests of the city and its taxpayers.

There being no other pleadings the case came to be heard on complaint and answer on November 9, 1954, and December 1, 1954. At these hearings the only witnesses called by plaintiff were certain officials of the City of Philadelphia, to wit: Michael Sura, Acting Procurement Commissioner; William M. Harned and Robert L. Taylor, members of the revenue committee of the Board of Trade; and Peter J. Carroll, administrative assistant at the Board of Trade. Plaintiff called no additional witnesses and defendant rested on the testimony taken by plaintiff.

## Discussion

At the hearings, plaintiff conceded the good faith of the municipal officers in making the award, and also conceded that all of the bidders for the concession were qualified. Consequently, the only questions before the court are (1) whether the procedure under which the bids were received and the award made conformed to law, and (2) whether the award was in fact made to the highest bidder. In a number of respects these two questions telescope into one.

Indeed, the complaint narrows the issue even more sharply. The gravamen of the complaint is that in making the award upon a percentage basis, rather than on a flat annual guarantee, the city acted unreasonably, capriciously, arbitrarily and illegally. A care-

ful study of the complaint fails to disclose any other objection to the award.

This being a case of first impressions under sections 6-500, 8-200, 8-201 and 4-502 of the Philadelphia Home Rule Charter, we shall discuss the pertinent issues raised or suggested at the trial, many of which were at the instance of the court. The fact that the procedure in the making of this award is governed by the foregoing sections of the charter is not contested by either plaintiff or defendant, and accordingly our discussion and conclusions pertain to these sections.

Under the charter, the duty of letting contracts for which competitive bids are required, i.e., contracts involving more than $2,000, is placed in the procurement department, headed by the procurement commissioner (section 6-500, section 8-200). Section 8-200 specifies the procedure as follows:

The procurement department must: (a) Advertise for sealed bids in one of the three newspapers having the largest paid circulation in the city and in such other newspaper as it deems necessary; (b) require a certified check in an appropriate amount, which must be stated in the specifications to accompany all bids, unless the department has in its discretion permitted a bidder to file an annual bond in such amount as the department may determine; (c) open the bids publicly and tabulate them in the presence of a representative of the city controller at the time specified for their opening; (d) award the contract to the lowest responsible bidder, except that the department may reject all bids if it shall deem it in the interest of the city to do so.

Within 10 days after the award of a contract, the successful bidder is required to substitute a performance bond for his certified check. The contract must be executed on behalf of the city by the procurement department but only after it has been approved as to

form by the city solicitor and as to availability of funds under the budget and appropriations by the city controller and the director of finance.

This is the standard procedure that the procurement department is to follow uniformly. However, a special provision, integrating into this procedure, covers the granting of concessions on city property. Section 8-201 provides:

"*Section 8-201. Concessions.* All concessions granted by any officer, department, board or commission of the City for the sale of products or the rendition of services for a consideration on City property shall be awarded by the Procurement Department only pursuant to the specifications of such officer, department, board or commission after competitive bidding and to the highest responsible bidder in a manner similar to that required by the preceding section relating to contracts for procurement involving an expenditure of more than $2,000.00."

The draftsmen's annotation to section 8-201 states:

"Purposes: City concessions may be valuable contract rights and to protect the interests of the City, competitive bidding and the following of the procedure detailed in Section 8-200 (2) are required in the making of awards of such concessions. This section applies to City officers and agencies, including boards and commissions such as the Board of Trade and Conventions and the Fairmount Park Commission. But such officers or agencies may specify the qualifications a bidder must meet for as a rule they are primarily responsible for the management of the premises on which the concession is to be let."

Section 4-502 of the charter vests the management of Convention Hall and the Commercial Museum in the Board of Trade and Conventions, usually known as the Board of Trade:

"*Section 4-502. Board of Trade and Conventions.*
The Board of Trade and Conventions shall manage
the Commercial Museum, Exhibition and Convention
Halls and grounds. It may lease for a charge or grant
the use without charge of the Exhibition Hall of the
Commercial Museum and the Convention Hall for
holding exhibitions, conventions and for other suitable
purposes, upon such terms and conditions as it shall
see fit. Permission may be granted to such individuals
or organizations to charge an admission fee and also
to charge exhibitors for the use of space therein but
all parts of the buildings or grounds of the Commer-
cial Museum shall be otherwise open to the free access
of the public."

The board of trade is composed of seven members
appointed by the Mayor in addition to the director of
commerce, the superintendent of schools of the School
District of Philadelphia, and the Secretary of Com-
merce and the Superintendent of Public Instruction
of the Commonwealth of Pennsylvania (section 3-900,
section 3-207). The appointed members serve without
compensation.

Under section 8-201, it would appear that a divi-
sion of functions exists with respect to the granting
of the restaurant concession at Convention Hall. In
the language of that section the concession is (a)
granted by the board of trade, but (b) awarded by
the procurement department. The latter must make
the award, pursuant to the specifications of the board,
to the highest responsible bidder in a manner similar
to that required under section 8-200 for the award of
contracts generally.

The testimony shows that the required division of
functions was adhered to in this case. The board of
trade submitted specifications to the procurement de-
partment calling for bids, for one, two and four-year

terms, on three alternate bases: Flat annual guaranteed rental, a percentage of the gross receipts and an annual guaranty plus a percentage of gross receipts. There were three bidders. All of them submitted bids in all of the categories.

It was, of course, impossible to determine the highest bid until the appropriate alternative was adopted. Under the charter, it would seem that the agency to make that decision is the board of trade. The board of trade is responsible for the management of Convention Hall. It has the experience needed to determine which alternative is in the best interest of the city. Just as the procurement department must, under the charter, accept specifications from the board of trade, because of the board's peculiar qualifications in the field, so it would appear that the procurement department must, where an option is to be chosen, rely on the board's qualifications to select the correct option, unless it should clearly appear to be arbitrary or capricious. Any other construction of section 8-201 would be incongruous and would defeat the purpose of the charter which seeks to obtain the judgment of the agency having the qualifications to make it. In its discretion, the board of trade selected the option calling for a flat guaranty plus a percentage of the gross receipts. The record shows that the procurement commissioner investigated all the facts and the reasons for the board's conclusion.

In any event, since the good faith of the city officials is conceded, the action of the board of trade in selecting that option and of the procurement commissioner in reviewing it is binding on this court unless the evidence clearly establishes that its action was arbitrary or capricious or manifested an abuse of discretion.

In McIntosh Road Materials Co. v. Woolworth et al., 365 Pa. 190, 210 (1950), the Supreme Court said:

"Where bids for public work are invited and received in the alternative, there is a presumption, in the absence of fraud or collusion, that the public officials charged with the duty of awarding a contract thereunder acted in good faith and in the best interests of the governmental agency in making the award: see *Wilson v. New Castle City*, supra; and *Parker v. Philadelphia*, 220 Pa. 208, 212, 69 A. 670. Nor will such an award be set aside except upon clear proof of abuse of discretion by the officials who made it: *Wilson v. New Castle City*, supra; and *Hibbs v. Arensberg*, supra. Here, there is *no* proof, let alone *clear* proof, of any such abuse of discretion in the making of the March 1st award."

Far from rebutting this presumption, the testimony given by the two members, constituting a majority of the revenue committee of the board of trade, who testified, clearly shows that the board did not abuse the discretion vested in it in making its selection.

The reason was succinctly stated by Mr. Harned, a restaurateur of many years' experience:

"BY THE COURT:

"Q. In other words, why did you choose the lower instead of the higher bid?

"A. Over a long period of time where you do not know exactly what your volume is going to be, it is sometimes safer to get a flat fee, plus percentage, and then you participate in the increased volume. At the same time, if business falls off in the four-year period, you are assured of a guaranteed income, and it appeared in our judgment, and it is so in most restaurant concessions, to be the better method of proceeding on bids."

Mr. Taylor, Chairman of the Revenue Committee, testified:

". . . So we got the bids in and we looked at the bids, and we decided in our opinion that the flat fee,

plus a percentage, brought sufficient revenue to the City on either a falling market or a rising market. It took care of a probable climb and produces high quality operation. When you consider you are not only operating refreshment stands but a quality restaurant, which was never done before, we decided four years was the best, because we were already selling space for 1958, and you have to have some continuity, not only for the future, but for capital expenditures.

"Q. Your Committee recommended this choice to the Board of Trade?

"A. We went to the Board and gave them our decision, and they authorized us to proceed."

And again, at page 112:

". . . again, it is related to the use of space, because the use of space brings in four times as much revenue as your refreshment stand and restaurant, so you have to keep your eye on the space as much as the refreshments and restaurant relate to it."

We are convinced from the evidence before us that the board gave full consideration to all the options before making its final choice. There is no evidence to the contrary. While it is possible to speculate that one of the other options might under certain hypothetical circumstances yield more revenue to the city, with consequent risks involved, only one group, the board of trade, can lawfully exercise the necessary judgment. That judgment was founded on reason. It is not for us to substitute our judgment for that of the board, and in any event, plaintiff has not offered any evidence to indicate that the board's conclusion was erroneous.

Plaintiff argues that if the board intended to use a fixed return plus a percentage, it should not have called for alternate proposals. However, when the board submitted its specifications to the procurement department, it had no way of knowing that the guar-

anty with the fixed percentage would have produced a satisfactory range. By requesting alternate proposals the board had an opportunity not only to judge the prospective return to the city from the method selected, but also to compare it with the best and the worst under the alternate proposals. The board of trade consists of a group of public-spirited citizens serving without compensation. It is to their credit that they devised a set of specifications which gave them an opportunity in the interests of the city to consider the question from all angles and to make a decision on the basis of concrete figures before them.

Plaintiff in his brief charges that the use of alternate proposals affords the city an opportunity for favoritism. But plaintiff on the record concedes the good faith of the city officials. If he had not, their good faith would have been presumed in any event: McIntosh Road Materials Co. v. Woolworth et al., supra, p. 5. Moreover, plaintiff's own evidence establishes the method used was far from unique but is customary throughout the country and has been used by the city, relating both to Convention Hall and to other concessions.

Although the good faith of the city officials was conceded at the hearing, nevertheless it was argued that the board of trade had acted irresponsibly in adopting an option which resulted in an award to Beresin & Loeb when at the same time one of the members of the board, Mr. Harned, said that to be able to pay the city a straight percentage of 31.3 per cent (the rejected percentage bid of the successful bidder) a concessionaire would have to gouge the public or serve inferior products. However, Mr. Harned made it clear that he was talking hypothetically. He expressed confidence in Beresin & Loeb's responsibility, being familiar with their work in handling the restaurant concession at Convention Hall during the years 1953 and

1954. There is no question whatever that Beresin & Loeb is a responsible bidder as everyone at the hearing readily conceded.

Therefore, since the board of trade exercised a proper discretion in selecting the proposal calling for a guaranty plus a percentage, the only question remaining is whether an award was properly made to the highest bidder under that option. Under the charter, section 8-201, this determination must be made by the procurement commissioner, and it was so made. It was also made by the board of trade but the procurement commissioner's was the final determination. The figures were initially calculated by the revenue committee of the board of trade. They clearly showed that on the basis of the previous 12 months' receipts at Convention Hall, Beresin & Loeb was the high bidder, and the revenue committee so advised the procurement commissioner with a recommendation that an award be made accordingly. However, even so, the procurement commissioner did not accept their calculations automatically. He met with the revenue committee and verified them. At the same time, although it was not his decision to make, he investigated why the board of trade had rejected the other options in favor of a guaranty plus a percentage. He quite apparently agreed with the board's conclusion as to the appropriate option, and we believe that if, under the charter, the ultimate decision were the procurement commissioner's, the result here would have been the same. In any event, having then verified that Beresin & Loeb was the high bidder, the procurement commissioner thereupon made the award to that bidder.

The previous 12 months' receipts of Beresin & Loeb were used as a criterion for a figure against which to apply the percentage bid. The evidence introduced supports the conclusion that the past 12 months' earn-

ings of the operator at Convention Hall afforded a reasonable basis for translating the percentages into figures for future guidance. Mr. Harned pointed out that the board reasonably expected receipts to increase at least for the first two years, on the one hand, because of the acquisition of air conditioning and because of their knowledge as to increased bookings for Convention Hall as contrasted with past bookings, but on the other, thought they might decline after two years because by that time New York City would have its own Convention Hall and would be in more active competition with Philadelphia for conventions on the basis of such facilities.

It was plaintiff who called the witnesses who so testified, and he offered no countervailing evidence of any kind to establish that the projection was unreasonable. He is, therefore, bound by the determination made. Certainly, in the absence of evidence to the contrary, we cannot assume that it was not reasonable to use the most recent actual experience as the best estimate, on the average, of the volume of receipts to be expected under the contract, particularly where it is apparent the committee, including a restaurateur of wide and long experience, an outstanding businessman and an attorney, drew on the facts known to them and their own general background in appraising future prospects as well.

Plaintiff did not attack the conclusion reached by the city officials. He did seek to show that the procurement commissioner was irresponsible in not verifying for himself the figures submitted by Beresin & Loeb. However, Beresin & Loeb are not strangers to the procurement commissioner, they have been operating at Convention Hall for two years and whether their figures were to be accepted by the procurement commissioner on the recommendation of the board of trade was a matter for his judgment. As it turned out,

Beresin & Loeb's figures, as informally furnished, were later certified as correct by a certified public accountant. If plaintiff had any reason to believe the figures were incorrect, plaintiff could have introduced evidence to establish that fact. Having failed to do so, plaintiff is bound by the judgment the procurement commissioner made.

Plaintiff seeks to persuade us that even though a correct result may have been reached, it was reached accidentally and not by the exercise of that judgment that the City Charter requires the procurement department to exercise.

To that end plaintiff relies on certain statements made by Mr. Sura right at the start of the case in reply to questions by the court. Having identified himself as the acting procurement commissioner, Mr. Sura went on:

"BY MR. CUNNINGHAM:

"Q. In that capacity, did you make an award upon the contract in question?

"A. With the recommendation of the Board of Trade.

"Q. But it is your duty to make the award?

"A. Yes, sir.

"BY JUDGE CARROLL:

"Q. Can you disregard the recommendation?

"A. No, I cannot.

"Q. It is mandatory?

"A. That's right."

It is to be noted that this interchange took place at the beginning of the testimony before the language of the charter and the division of authority between the procurement department and the board of trade was developed. It will also be noted that Mr. Sura's answers to the first two questions were correct. It is his duty to make the award and he makes it on the recommendation of the board of trade. His last two

statements taken from context would indicate that he has no authority to disagree with the board of trade but is simply a rubber stamp. However, the answers to the two questions posed by the court must be examined from the position in which Mr. Sura sat at the time he was testifying. He was not giving a theoretical exposition of his duties generally as procurement commissioner or even of his duties generally with respect to the board of trade. He was obviously speaking of those things that were in issue in determining who should get the award in this case. Just as obviously, what he meant was that with respect to the things that were before the court for decision, he could not "disregard entirely", but should at least examine carefully and accord proper weight to, the recommendations of the board given in one sphere large authority under the charter and who in any event will have to conduct the facilities under which the bid is awarded.

Viewed in this light, the responses of the procurement commissioner to the court, as quoted above, are perfectly understandable. From the facts before him, there was no recommendation from the board of trade that he could disregard and his statement to the court was obviously to that effect. Throughout the rest of his testimony he made it clear he was not a rubber stamp, that he made the award only after he satisfied himself of its correctness and that the board of trade carried out its functions in a responsible manner.

Thus, what the evidence establishes is an award made by the procurement commissioner on the recommendation of the board of trade to the highest bidder under the option selected by the board of trade. The fact that under certain hypothetical facts (which might or might not develop) there might have been a higher bid under some other option rejected by the board of trade is of no moment to this court, or to

anyone else, so long as it is not established that the board of trade acted capriciously or arbitrarily or in bad faith in rejecting the alternate options. There is nothing in the record to show that the proper award was not made on the merits and nothing to show that all the procedures required by the charter were not followed by the officers to whom those procedures are respectively entrusted.

For the foregoing reasons we have reached the following

### Conclusions of Law

1. The award of the contract for the restaurant and concession facilities at Convention Hall and Commercial Museum, made on November 3, 1953, was made in accordance with section 8-201 of the Philadelphia Home Rule Charter and is in every respect a legal award.

Accordingly, we make the following

### Final Decree

And now, to wit, January 31, 1955, this matter having come on to be heard, upon consideration of the complaint, answer and proofs, it is

Ordered, adjudged and decreed: 1. The complaint be and is hereby dismissed; 2. that plaintiff pay the costs.

Plaintiff's requests for findings of fact nos. 2 to 8 inclusive, 11, 12 and 18 are affirmed. Request no. 1 is denied as stated, and requests nos. 9, 10, 13, 14, 15, 16, 17 and 19 are denied.

Plaintiff's requests for conclusions of law nos. 1 and 5 are affirmed, and requests nos. 2, 3, 4 and 6 are denied.

Defendant's requests for findings of fact are approved, except request no. 10 which is denied as stated.

Defendant's requests for conclusions of law nos. 1 to 6, inclusive, are affirmed.