## Dickinson et ux. v. City of Philadelphia et al.

*David F. Maxwell*, for plaintiffs.

*Charles I. Thompson*, for IBM Comporation, defendant.

*Howard E. Stern*, assistant city solicitor, for other defendants.

BROWN, JR., P. J., January 5, 1951.—This proceeding in equity was instituted by a taxpayers' bill to enjoin the City of Philadelphia, the City Controller and other of its officers, and the International Business Machines Corporation (referred to herein also as IBM), from proceeding to carry one and perform a contract entered into by the City and IBM, without competitive bidding, for the leasing and installation of certain mechanical billing and accounting equipment in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes, and to have this contract and the appropriation made to the City Controller therefor declared invalid and unlawful. In the answer of the municipal defendants, executed by the City Controller, in which IBM joined, it was averred, inter alia, that this suit was instituted at the request of and for the benefit of Remington Rand, Inc. (referred to herein also as Rem Rand), and that competitive bidding was not required as the contract was for the rental of equipment obtainable from a single source of supply and made under exclusive patents, and for personal services.

After hearing upon the bill, answer and proofs, the City, by its officers, prepared specifications and invited, by public advertisement, sealed bids for the rental of

punch-card equipment and the furnishing of certain services and supplies to accomplish, inter alia, the installation of accounting and financial records in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes.

Subsequently, by leave of court, plaintiffs filed a supplemental bill setting forth, inter alia, that bids were submitted by IBM and Rem Rand, that although the bid of Rem Rand was lower, it was rejected and the bid of IBM accepted, and praying that defendants be restrained from entering into and proceeding to carry out any contract based on the specifications and the bid of IBM, that the acceptance of its bid be declared invalid and unlawful, and that the City, by its proper officials, be directed to accept the bid of Rem Rand and enter into a contract pursuant thereto. The answer of the municipal defendants, in which IBM joined, to this supplemental bill, averred, inter alia, that upon analysis the bid of IBM was lower than the bid of Rem Rand, and that in accepting the bid of IBM the City Controller, with the concurrence of the Director of the Department of Supplies and Purchases, exercised the discretion vested in him by law honestly and in good faith.

### Findings of Fact

From the admissions in the pleadings, and the proofs, the facts are found to be as follows:

1. Plaintiffs, Gilbert I. Dickinson and Christine A. Dickinson, are citizens, residents and taxpayers of the City of Philadelphia.

2. Defendant, City of Philadelphia, is a municipal corporation of the first class of the Commonwealth of Pennsylvania; defendants, Bernard Samuel, Joseph S. Clark, Jr., Richardson Dilworth and W. Frank Marshall, are respectively the Mayor, City Controller, City Treasurer and Receiver of Taxes of said City, and de-

fendant, International Business Machines Corporation, is a corporation doing business in Pennsylvania.

3. By ordinance adopted by City Council and approved by the Mayor on December 9, 1949, there was appropriated to the Department of Supplies and Purchases for the account of the City Controller the sum of $30,000 for the installation of accounting and financing records in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes. This appropriation was subsequently transferred to the City Controller directly for the accomplishment of the same undertaking by ordinance of January 20, 1950. Although $15,000 of this amount was transferred to other funds for other uses by an ordinance of May 5, 1950, this sum was replaced by $15,000 appropriated to the City Controller from the sewer rental budget by ordinance approved the same date, thus restoring the amount of the original appropriation.

4. The accounting operations in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes are billing, which consists of the preparation of statements of charges for water assessments and sewer rents, and settlement, which includes crediting payments of these charges made by property owners.

5. On August 30, 1950, the City Controller submitted to the City Solicitor for his approval a certificate and a form of contract between the City and IBM dated August 17, 1950, for furnishing equipment and services incidental thereto required for the accomplishment of the purpose for which the appropriation was made.

6. In his certificate, the City Controller stated that the emergency arising from the international situation required the immediate execution of the contract, that the machinery subject thereto was available only till September 20, 1950, that in his judgment the equip-

ment of IBM would perform the required accounting services more efficiently and at less overall cost to the City than the machines of any competitor, that the supervising personnel of IBM was superior in quality and caliber, and that as there was only one source of supply of equipment of IBM, competitive bidding was unnecessary.

7. The City Solicitor signed a certificate on or about August 31, 1950, that the contract was in proper form, drawn and executed according to law.

8. In reliance on the certificate, signed by the City Controller and the City Solicitor, the Mayor, on September 1, 1950, executed the contract on behalf of the City.

9. This contract was negotiated by the City Controller and not by the Department of Supplies and Purchases, and it was not founded upon any requisition drawn on that Department. There was no public advertisement inviting competitive bids or the preparation of specifications to provide a basis for competitive bidding. Instead IBM, Rem Rand and other manufacturers of accounting machinery were requested, privately and individually, to submit proposals relating to the cost of installation and operation of suitable equipment, and the City Controller, through members of his staff, conducted an investigation for the purpose of evaluating the equipment of the various manufacturers.

10. The City Controller determined that a punchcard system would most satisfactorily perform the billing and settlement of water assessments and sewer rents and the other accounting procedures in connection therewith.

11. There are only two companies which manufacture the business machines required by the punch-card system of accounting, namely, IBM and Rem Rand. The machines of both are manufactured under exclusive patents, and both companies can supply machines

that would permit the establishment of an adequate punch-card accounting system in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes. Both use a device for punching into a card certain basic information, such as the name, address, assessment, meter size, and other facts, in the form of holes (round in the system of Rem Rand and rectangular in the system of IBM), and both use machines for automatically transferring the information so recorded by the punched holes to billing forms, accounting records and other cards. It is impossible to mingle or interchange the equipment of the two companies. One difference is that in the system of IBM it is possible to employ electronic calculators, whereas in the system of Rem Rand these calculators are not available, but calculation of the amounts of the charges is accomplished by "gang-punching", which requires a sorting process before and after calculation. Another difference is that the machines of IBM can electrically detect pencil marks on a card and automatically punch a corresponding hole in the card ("mark-sensing"), while in the system of Rem Rand holes are punched by an operator and cannot be automatically derived from pencil marks.

12. In March, 1949, punch-card accounting machines manufactured by Rem Rand were installed in the Real Estate Tax Division of the office of the Receiver of Taxes. Since such installation, these machines have been used in the billing and settlement of the real estate taxes, the other accounting procedures in connection therewith, and the settlement of all water assessments and sewer rents. The billing of water assessments and sewer rents, however, has been done by addressograph-multigraph plates.

13. After investigation and consideration of the matter for six months, the City Controller decided that the equipment manufactured by IBM was best suited

for performing the accounting operations in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes, for the reasons stated in his certificate of August 30, 1950, and for the further reasons that it would make available the use of electronic calculators and mark-sensing devices which would greatly facilitate meter reading and the billing of water assessments and sewer rents.

14. The machines necessary to perform punch-card accounting procedures in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes manufactured by IBM have been, are and will continue to be available notwithstanding the international situation, but in the event that such machines had not been or were not available, there would not have been nor will there be an emergency.

15. The conclusion of the City Controller to install the machines and equipment of IBM was reached against the advice of the Receiver of Taxes, who recommended that the machines and equipment of Rem Rand already in operation in the Real Estate Tax Division of his office be utilized and supplemented to perform accounting procedures in the Water Assessment and Sewer Rent Division. He did not consent to or approve, but opposed, the contract with IBM. A like recommendation was made by Turner, Crook & Zebley, an accounting firm employed by the preceding City Controller to make a study of the accounting procedures in the Department of the Receiver of Taxes and submit suggestions for improvement.

16. Subsequently, after evidence was presented in this proceeding disclosing, inter alia, that it was possible to prepare specifications for the submission of bids for the rental of machines, and the furnishing of services and supplies in connection with the operation thereof, for a punch-card system of accounting, in such form, manner and detail as to enable prospective bid-

ders to submit bids based on such specifications and a common and equal standard, the City Controller, in collaboration with the Director of the Department of Supplies and Purchases, and after consultation with Rem Rand and IBM, prepared specifications entitled "Class 97-1280-Rental of Punch Card Equipment & Furnishing Certain Services & Supplies".

17. The specifications were divided into two parts: Part I contemplated the installation of an accounting system for the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes, including the preparation of a master file, preparation of the 1951 minimum billing, and one excess billing for 1951. Part II contemplated equipment for additional excess billings and all settlements for 1951, and for the performance of the entire billing and settlement operations in 1952 and 1953. Because the City Controller's appropriation was limited to $30,000, it was understood that the response to part II of the specifications would be advisory only for the purpose of indicating to the City Controller the cost of carrying on after original installation had been made. The proposed contract was to be awarded only under part I.

18. Paragraph 8 of part I of the specifications permitted each bidder to submit bids in either or both of the following forms:

"(a) Fixed over-all price for all the machines, services, and materials designated to be furnished by the bidder, not subject to change because of failure of bidder to correctly appraise volume of work involved or productivity of personnel, but subject to adjustment up or down as the result of modifications in the system by direction of the Controller. Quotations in this form should be accompanied by a schedule showing basis for computation.

"(b) Bidder's estimate of number and type of units required, and for what period, and a fixed rental per

month for each item; bidder's estimate of other supplies required with the unit price thereof; bidder's estimate of cost of service requested for which City will pay."

19. On October 12, 13 and 14, 1950, the Director of the Department of Supplies and Purchases advertised an invitation for the submission of sealed bids based on these specifications.

20. Bids or proposals were duly received from IBM and Rem Rand, and on October 23, 1950, they were opened by the Director of the Department of Supplies and Purchases in the presence of the City Controller.

21. The respective bids or proposals were accompanied by a detailed description of the manner and method of operation, the type and number of units to be supplied, number of employees required and other data. The proposal of IBM was only under option (b) of the specifications, which permitted the submission of estimates, whereas the bid received from Rem Rand contained quotations under both options, but was based on the partial use and availability of its machines already installed in the Real Estate Tax Division of the office of the Receiver of Taxes.

22. The bid of Rem Rand did not include all the machinery necessary for the successful operation of the system of punch-card billing and settlement contemplated by the specifications, nor any method or machinery for verification of entries required by approved accounting practices.

23. The proposal of IBM under option (b) for the machines, supplies and services required for the operations to be performed was $13,171, while the bid of Rem Rand under option (a) was $9,760.20, and under option (b) was $8,376.20, but when necessary adjustments for equipment not included in the bids of the two companies were made, the difference was reduced

and the proposal of Rem Rand was lower than that of IBM by approximately $480.

24. The City Controller caused an intensive study of the two bids or proposals and accompanying data to be made, and as a result of the reports prepared on the basis of this study and of his own independent consideration of the bids or proposals, he concluded that the proposal of IBM was more advantageous to the City, that the bid submitted by Rem Rand was not responsive to the specifications and that IBM was the lowest responsible bidder, in which conclusions the Director of the Department of Supplies and Purchases concurred.

25. On November 6, 1950, the City Controller notiged Rem Rand that its bid was rejected, returning to the latter the deposit which had accompanied its bid, and notified IBM that its proposal was accepted. He then requested the City Solicitor to prepare a contract to be entered into between the City and IBM.

26. Although integration of the accounting machinery in the Real Estate Tax Division and the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes was and is desirable in order to effect economies by avoiding duplication in equipment and personnel, such integration was at the time the specifications were prepared, and still is, impracticable.

27. The Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes can prepare bills for 1951 by means of addressograph-multigraph plates as has been done in past years, while the punch-card accounting system of IBM can be installed in time to prepare these bills.

### Discussion

"The city controller is 'the city's head bookkeeper' whose duties . . . 'are partly ministerial and partly discretionary, and while the courts will not review his

discretion exercised in a proper case, yet he is not above the law, and his discretion is not arbitrary but legal' . . .": *Sinking Fund Commissioners v. Philadelphia*, 320 Pa. 394, 402. "When therefore he is called upon by the courts the facts must be made to appear sufficiently to show that they bring the case within his discretion, and that it was exercised in obedience to law. On this subject the courts are the final authority, and their jurisdiction cannot be ousted by simply putting forth the assertion of discretionary power without showing that the matter was properly within such discretion": *Com. ex rel. v. Philadelphia*, 176 Pa. 588, 592. The Act of June 25, 1937, P. L. 2094, 53 P. S. §3163, amending section 3 of Article XII of the Act of June 25, 1919, P. L. 581, entitled "An Act for the better government of cities of the first class of this Commonwealth", by "further defining the powers and duties of the city controller", "imposing limitations on the powers of and duties on departments and officers", and "regulating commitments", provides, inter alia, that the City Controller shall "keep all accounting or financial records of all departments of the city government", "have complete supervision and control over such records and accounts", have "power to prohibit the keeping of any accounting or financial records by any department . . . except those provided for in this section", and have "supervision and control over the manner, method, and place of payment of all bills for amounts due and payable into the city treasury, and shall prescribe the form and method of preparing all bills and receipts". Being specifically empowered to "prescribe the form and method of preparing all bills and receipts" for amounts due and payable into the city treasury, or, construing these words "according to their common and approved usage" (section 33 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 P. S. §533), to dictate, appoint, direct, or ordain the

shape, particular arrangement, and definite procedure or process (Webster's New International Dictionary, 1938 Edition, pages 991, 1548 and 1954) of preparing such bills and receipts, it is apparent that the City Controller is authorized to install or establish a punch-card system of billing and settlement of water assessments and sewer rents in the office of the Receiver of Taxes, and to determine the specific details thereof. In so doing, he acts as "the city's head bookkeeper", charged with keeping and auditing its accounting and financial records, and he does not interfere with the Receiver of Taxes in the performance of the latter's duties of collecting and receiving all taxes and public assessments payable to and receivable by the city (enumerated in *Stewart v. Hadley*, 327 Pa. 66, 70-72). The division between the respective powers and duties of these two municipal officers is clear: The City Controller prescribes the form and method of preparing bills and receipts, whereas the Receiver of Taxes makes out and sends the bills to the taxpayers as required by section 14 of the Act of April 21, 1855, P. L. 264, 53 P. S. §4851. Any conflict between the occupants of the two offices is resolvable by respect for the other's obligations imposed by law.

Section 4 of Article XVII of the Act of June 25, 1919, P. L. 581, 53 P. S. §3274, declares: "No contract shall be binding upon the city unless an appropriation therefor has previously been made . . . , and any contract made . . . in violation of this article shall be absolutely void." The appropriation for the installation of the punch-card accounting system in the Water Assessment and Sewer Rent Division of the Office of the Receiver of Taxes was originally made to the Department of Supplies and Purchases for the account of the City Controller, but subsequently moneys therefor were appropriated directly to the latter. Although section 3 of Article XXIV of the Act of 1919, supra, sup-

plied by section 3 of the Act of March 19, 1925, P. L. 56, and amended by section 3 of the Act of May 1, 1929, P. L. 1189, 53 P.S. §3393, provides that "appropriations of money for the purchase and supply of such articles [i. e., articles of personal property used by the various departments of the city] shall be made to, and shall be expended by, the Department of Supplies and Purchases", it is to be noted that only "contracts for the *purchase* of such articles" must "be made and entered into by and with" that department. (Emphasis added.) The distinction between "purchase" and "supply" is drawn by the provisions that the articles "so purchased" are to be placed in warehouses, and obtained by the various departments "by requisition on the Department of Supplies and Purchases, and not by direct purchase", and by the provisions forbidding the City Controller to countersign and the City Treasurer to pay "for the purchase of such articles" except upon certificate that they "have been purchased by" the authority of the Department of Supplies and Purchases. Accordingly, it is clear that the term "supply" was not intended to comprehend the obtaining of articles by the Department of Supplies and Purchases by means other than by "purchase", such as the *leasing* of business machines for the billing and settlement of water assessments and sewer rents, but signifies the process of distribution to occur after the Department of Supplies and Purchases had made purchases. Besides, these machines are designed for accounting purposes, and the economies effected by purchasing articles in bulk, for which the Department of Supplies and Purchases was created, would not accrue to the city by purchasing or leasing these machines in like manner. The Director of the Department of Supplies and Purchases collaborated with the City Controller in the preparation of the specifications for the machines in question, advertised the invitation for the submission of sealed bids based

on these specifications, opened them in the presence of the City Controller, and concurred in the latter's rejecting the bid of Remington Rand, Inc., and accepting the proposal of International Business Machines Corporation, but, as the City Controller is the municipal officer obliged by law to "prescribe the form and method of preparing all bills and receipts" for amounts due and payable into the city treasury, it is his duty to determine which machines are to be used for such purposes, subject, of course, to the requirements of the law with respect to competitive bidding. Under the circumstances it appears to be immaterial whether the appropriation for the installation of accounting and financial records in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes was made to the Department of Supplies and Purchases for the account of the City Controller or to the City Controller directly. Compare *Potts v. Philadelphia*, 195 Pa. 619, 631-632. The important factor is that there be an appropriation to support the contract: *E. E. Hollenback, Inc., v. Hadley*, 312 Pa. 176, 178-180.

"In awarding contracts, the officers of the city must comply strictly with the requirements of the statutes and ordinances. . . . [These provisions] cannot be evaded or disregarded by the city or by its officials. The protection of the public as well as the rights of the contractor require their rigid enforcement": *Smith v. Philadelphia*, 227 Pa. 423, 430, 431. Section 6 of the Act of May 23, 1874, P. L. 230, 53 P. S. §282, provides that "all work and materials required by the city, shall be furnished, . . . under contract to be given to the lowest responsible bidder, under such regulations as shall be prescribed by ordinance". The ordinance of the City of Philadelphia of December 26, 1882, Ordinances, 1882, pages 328-329, enacted to carry the statute into effect, authorizes and directs that advertisements be made for all work and materials re-

quired, and that the contract be awarded to the lowest responsible bidder. "It cannot be doubted that the true intent of the act of 1874, and the ordinances passed in pursuance thereof, regulating the awarding of public contracts, is to secure to the city the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms. To that end, it is esential that there should be plans and specifications on which to bid; otherwise there can be no competitive bidding": *Mazet v. Pittsburgh*, 137 Pa. 548, 561-562.

" 'Where, as in this case, the articles to be furnished are protected by patents and a uniform standard [can be] established and any one of several patented appliances [would meet] the requirements of the specifications, . . . the interest of a municipality will be best served by asking for bids for any or all. The field is equally open to each bidder and the power of a monopoly in the thing is broken' ": *Brener v. Philadelphia et al.*, 305 Pa. 182, 186-187; *Parker v. Philadelphia*, 220 Pa. 208, 210-211.

Although the statutory provisions requiring specifications and advertising for proposals or bids do not apply where there is an actual emergency affecting public health or safety (*Silsby Mfg. Co. v. Allentown*, 153 Pa. 319, 323-324; *Underwood Corporation v. Chester Municipal Authority*, 49 D. & C. 295, 298-299; *Upper Darby Twp. v. Ramsdell Construction Co.*, 51 D. & C. 246, 249-251), or to a contract for the employment of attorneys, physicians, engineers, architects, or others whose services involve professional skill, knowledge and judgment (*Stratton v. Allegheny County*, 245 Pa. 519, 526-527), neither of these situations is involved in the present proceeding, for the subject matter is a proposed contract covering the installation of a punch-card system for the billing and

settlement of water assessments and sewer rents by means of available mechanical or electrical machines manufactured by two companies to replace the system now being used, and so the provisions of the law with respect to competitive bidding must be complied with.

It is well settled that " ' "lowest responsible bidder" does not necessarily mean the bidder whose offer to do the work is the lowest.' " . . . " 'The term "lowest responsible bidder" doe not mean the lowest bidder in dollars; nor does it mean the [proper municipal officials] may capriciously select the highest bidder regardless of responsibility or cost. What the law requires is the exercise of a sound discretion' ": *McIntosh Road Materials Co. v. Woolworth*, 365 Pa. 190, 208. The "question of who is the lowest responsible bidder is one for the sound discretion of the proper municipal authority. . . .": *Kratz v. Allentown*, 304 Pa. 51, 54. See also *Pearlman v. Pittsburgh et al.*, 304 Pa. 24, 28-29. The City Controller, "having made a full and careful investigation, might, for sufficient cause and in the exercise of a sound discretion, accept as the lowest bid one not the lowest in dollars": *Brener v. Philadelphia*, supra, 186. After the City Controller made such an investigation, he concluded that the proposal of IBM was more advantageous to the City, that the equipment manufactured by it was best suited for performing the billing and accounting operations in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes, and that it was the lowest responsible bidder. It is true that the bid of Rem Rand was lower "in dollars", but in the judgment of the City Controller the machines manufactured by it were not so suitable for the purposes for which they were it be used. Furthermore, the bid of Rem Rand was based, in part, upon utilizing in the Water Assessment and Sewer Rent Division certain of its machines already installed in the Real Estate Tax Division of the

office of the Receiver of Taxes at times when such equipment was not in full use. The availableness of these machines for such additional use cannot, however, be definitely determined. Also, the specifications called for bids covering all the accounting machines required to perform the billing and settlement of water assessments and sewer rents without allowance for the use of equipment in any other division or department as integration at the time was properly considered impracticable. Accordingly, the bid of Rem Rand made under both options (a) and (b) of paragraph 8 of part I was not responsive to the specifications, and was, therefore, invalid: *D. N. Corporation v. Roudabush, etc.*, 309 Pa. 393-398; *Guthrie v. Armstrong et al.*, 303 Pa. 11, 18-19. Compare *Harris v. Philadelphia et al.*, 283 Pa. 496, 502, 508. " 'Unless the bid respond to the proposal in all material respects it is not a bid at all, but a new proposition' ": *Bailey v. Gordon*, 67 D. & C. 411, 419. Subsequent offers by Rem Rand to furnish all the equipment necessary for the billing and settlement of water assessments and sewer rents for the prices set forth in its bid would constitute private negotiations, and an award made pursuant thereto would also be invalid. "Negotiations of such nature [are] foreign to the purpose and spirit of the law relative to the requirements for bidding and the award of contracts for public work . . .": *McIntosh Road Materials Co. v. Woolworth*, supra, 205.

The specifications prepared by the City Controller, in collaboration with the Director of the Department of Supplies and Purchases, set forth, in general terms, the work to be done under any contract which should be awarded pursuant thereto and established minimum requirements of the punch-card billing and accounting system to be installed. To a limited extent, this enabled each bidder "to write his own specifications", but, since it would have been impossible for these officials to draft

specifications in minute detail for machinery so unique and complex as that manufactured for such purposes, this was "permissible and warranted under the circumstances": *Corcoran v. Philadelphia et al.*, 363 Pa. 606, 612-613. See also *Brener v. Philadelphia*, supra, 186. Option (b) of paragraph 8 of part I of the specifications, however, went further than this. It invited proposals based upon the bidder's "estimate" of four fundamental elements, namely, the number and type of units required, the length of the period during which each unit would be needed, other supplies required, and cost of services requested for which the city would pay. Although the bidder, under this option, was required to state fixed monthly rentals for the machines and unit prices of the supplies, such a proposal would not ensure that the accounting procedures in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes would be performed within the period set forth in the proposal. If any one of these estimates was inaccurate or too optimistic, the city would be compelled to expend additional funds in order to have the work completed; if the time required was greater than that *estimated* in the proposal, the city would have to pay extra rental for the machines necessary to consummate the undertaking. The distinction between a bid and an estimate is clear. A bid is "an offer to perform a contract for work and labor or supplying materials at a specific price": Bouvier's Law Dictionary, Rawle's Third Revision, page 342; Black's Law Dictionary, 3rd Edition, page 213. But an estimate is "a rough or approximate calculation only": Black's Law Dictionary, 3rd Edition, page 687. When competition consists only of submitting the lowest *estimate*, and such estimate is known *not* to be conclusive of the amount to be paid by the city, "the benefit and advantage of fair and just competition between bidders" is not secured for the city, and "every avenue

to favoritism and fraud" is not closed: *Mazet v. Pittsburg*, supra, 561-562. Indeed, the determination of the lowest responsible bidder might well be "the result of private negotiations between the [municipal authorities] and the successful contracting firm, without regard to the conditions of the open competitive bidding and the requirments of the act of assembly and the municipal ordinances": *Louchheim v. Philadelphia*, 218 Pa. 100, 103. When specifications permit a bidder to fix the time within which a building is to be completed if the contract should be awarded to him, there is "no common basis upon which bids could be computed": *Hibbs v. Arensberg*, 276 Pa. 24, 28; *Edmundson v. Pittsburgh School District*, 248 Pa. 559, 563. Likewise, in preparing the specifications involved in this proceeding, it "was the duty of the city officials to see that all the facts necessary to intelligent bidding were given the public, and it was their imperative duty, for the protection of the city, to see that the contract with the successful bidder [would be] expressed in clear and explicit language . . ., [and not] leave the door of the city treasury sufficiently ajar to justify the contractor in entering and demanding more than . . . the compensation stipulated in the . . . contract . . .": *Smith v. Philadelphia*, supra, 430. Consequently, option (b) of the specifications, supra, by inviting only *estimates*, and *not* firm bids binding in price upon the respective bidders, was not in accordance with the requirements of the law for competitive bidding. A contract pursuant to or based on a proposal or bid submitted thereunder could not be sustained. Since the only proposal submitted by IBM is under this option (b) of the specifications and contains only *estimates*, the impossiblity of its supporting a specific or definitive contract at a fixed price for the equipment to be furnished the city is apparent, and a contract based thereon would be invalid.

It follows that a contract cannot be entered into by the municipal authorities with either Remington Rand, Inc., of International Business Machines Corporation pursuant to their respective bids or proposals under the present specifications for the installation of a punch-card billing and accounting system in the Water Assessment and Sewer Rent Division of the Office of the Receiver of Taxes.

### Conclusions of Law

1. The City Controller is empowered to install or establish a punch-card billing and accounting system in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes.

2. An appropriation to the City Controller directly or to the Department of Supplies and Purchases for his account will support a contract for the rental of business machines in connection with the installation of accounting and financing records in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes.

3. As the contract between the City and International Business Machines Corporation dated August 17, 1950, was made by private negotiations and without regard to the requirements of the law with respect to competitive bidding, it was and is invalid.

4. As the bid submitted by Remington Rand, Inc., was not responsive to the specifications, prepared by the City Controller in collaboration with the Director of the Department of Supplies and Purchases, it is invalid.

5. As option (b) of paragraph 8 of part I of the specifications invited only estimates, and not firm bids binding in price upon bidders, it was contrary to the requirements of the law for competitive bidding, and a contract pursuant to the proposal of the International

Business Machines Corporation thereunder would be invalid.

6. The municipal authorities should be restrained from carrying out the contract between the City and the International Business Machines Corporation dated August 17, 1950; from entering into and proceeding to carry out the proposed contract between the City and this company pursuant to the proposal submitted by the latter under option (b) of the aforesaid specifications, and from awarding, entering into and proceeding to carry out any contract with Remington Rand, Inc., pursuant to its bid under the said specifications.

## Decree Nisi

And now, January 5, 1951, upon consideration of the foregoing case, it is ordered, adjudged and decreed that the Mayor of the City of Philadelphia, the City Controller, and its other officers be, and they are hereby, restrained and enjoined from carrying out a contract between the City and International Business Machines Corporation dated August 17, 1950, and from entering into and proceeding to carry out any contract between the City and either International Business Machines Corporation or Remington Rand, Inc., in accordance with proposals or bids submitted by them respectively under the specifications prepared by the City Controller in collaboration with the Director of the Department of Supplies and Purchases, entitled "Class 97-1280-Rental and Punch Card Equipment & Furnishing Certain Services & Supplies", for the installation of accounting and financing records in the Water Assessment and Sewer Rent Division of the office of the Receiver of Taxes.

The prothonotary will enter a decree nisi in the terms above set forth, and will notify counsel thereof, and of the filing of these findings and conclusions; and,

further, that if exceptions are not filed thereto within ten days from the receipt of said notice, a decree absolute in the sense of the decree nisi will be entered as of course.